## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:20-CR-35-PPS-JPK |
| | ) | |
| JOSEPH SUMBRY, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion to Reopen Detention Hearing [DE 24], filed by Defendant Joseph Sumbry. As originally filed, the motion sought to reopen Sumbry's detention hearing pursuant to 18 U.S.C. 3142(f) based on "additional evidence" concerning his "potential danger to the community" and a "health risk" posed by his continued detention. (Motion ¶ 2, ECF No. 24). Specifically, the motion alleged the following as new facts: (1) a witness (Ms. Devin Brown) would testify that a shotgun and shells found in the residence where Sumbry was arrested belonged to her ex-husband and were unknown to Sumbry during his stay there; (2) a Northwest Indiana Times report that inmates where Sumbry is being detained have tested positive for COVID-19, "putting all other jail inmates and personnel at risk"; and (3) the continuation of Sumbry's trial pursuant to this Court's General Order 2020-10 addressing court operations during the COVID-19 pandemic. (*Id*. at ¶ 2). Based on these developments, the motion requested reconsideration of this Court's April 1, 2020 Order of Detention (ECF No. 21) and sought Sumbry's release on any suitable conditions.

During a telephonic hearing on April 16, 2020, the Court inquired as to whether Sumbry intended to rely solely on § 3142(f), or also assert § 3142(i), particularly insofar as his motion raised issues concerning COVID-19. (ECF No. 27). Sumbry opted to pursue release under both

provisions, and at Sumbry's request, the Court allowed expedited briefing and set a video teleconference hearing on April 27, 2020. (*Id*.). Having considered the parties' briefs (ECF Nos. 30-31) and the evidence and argument presented at the April 27 hearing (ECF No. 32), the Court now **DENIES** Sumbry's requests for release under § 3142(f) and (i) for the following reasons.

## BACKGROUND

### I.    Pending Charges and Criminal History

The Indictment in this case includes two charges: knowing possession by a felon of firearms (Count I) and ammunition (Count II) in violation of 18 U.S.C. § 922(g). (ECF No. 9). Both charges relate to Sumbry's prior arrest on state gun charges last February in Gary, Indiana. (ECF No. 1). According to the preceding criminal Complaint and accompanying Affidavit, two Gary police officers encountered Sumbry and a second man (Andre Jones) when responding to a shots-fired call near 23rd Avenue and Jennings Street on February 27, 2020. (*Id*. at ¶ 5). The men were walking in the area, and the officers approached them from a marked police car and asked if they had heard shots fired. (*Id*.). Sumbry then walked to an area between two residences out of the officers' view, and one of the officers heard the sound of metal hitting the sidewalk while Sumbry was between the residences. (*Id*.). Sumbry then emerged from between the residences, both men were detained, and one of the officers recovered two loaded weapons from the area between the residences where Sumbry had been – a Walther .380 ACP caliber semiautomatic pistol loaded with .380 ACP caliber ammunition, and a pink-colored CPX-1 9 mm Luger caliber semiautomatic pistol with an extended magazine containing live 9 mm ammunition. (*Id*. at ¶ 6). Also according to the Complaint, when Sumbry was later arrested and searched, two 12 gauge shotgun shells were found in his jacket pocket and an empty firearm holster was affixed to his belt. (*Id*. at ¶ 7).

At the time of his February 27 arrest by Gary police, Sumbry had been convicted of multiple felonies, including possession of a controlled substance, family violence, auto theft, damage to property, and terroristic threats, as well as several other felony charges for which he failed to appear, including false imprisonment in 2012 and kidnapping and cruelty to children in 2002. (*Id*. at 6-11). He also had a conviction for misdemeanor escape from custody in Texas in 1997. (*Id.* at 4).

## II. Sumbry's Federal Arrest and Initial Detention Hearing

Following his arrest on the Indiana state gun charges, Sumbry was released on bond by the Lake County Superior Court on February 29, 2020 (*id*. at 11), and then arrested in the instant federal case on March 12, 2020. (ECF No. 5). Sumbry appeared initially before this Court on March 13, 2020, and the government sought detention. (ECF No. 3). With Sumbry's consent and pursuant to General Order No. 2020-08, this Court held a detention hearing on March 30, 2020, at which Sumbry appeared by video. (ECF No. 20).[1]

By proffer, the government offered an account of one of the federal ATF agents who participated in Sumbry's March 12 arrest in the instant case. According to the proffer, Sumbry was arrested at a residence on Jennings Street in the same location where he was previously arrested by Gary police, and the individuals inside the residence failed to open the door initially, requiring the agents to open it forcibly. The proffer also alleged that a 12 gauge shotgun was found in plain sight in the bedroom where Sumbry was staying, 12 gauge shotgun shells matching those found in

---

[1] On March 23, 2020, after consulting with appointed counsel, Sumbry filed a written consent to appear at the detention hearing by video (ECF No. 15), and two telephonic status conferences were held over the next few days regarding the arrangements for his video appearance. (ECF Nos. 16-17). On March 27, however, Sumbry withdrew his consent to appear by video and moved for relief from the Court's General Order No. 2020-06, which closed the courthouse to the public. (ECF No. 18). Given Sumbry's motion, the Court sought to reschedule the detention hearing and quickly arrange for his personal appearance. (ECF No. 19). But Sumbry then withdrew his motion and again consented to a video appearance, and the detention hearing was held with his appearance by video on March 30, 2020, as originally scheduled. (ECF No. 20).

Sumbry's jacket pocket at the time of his prior arrest by Gary police were located in the residence, and a firearm holster matching the one found on Sumbry's belt at the time of his prior arrest was found as well. The government also recounted Sumbry's multiple prior convictions.

Regarding Sumbry's risk of non-appearance, the Government noted his primary ties outside this community, as he was apparently residing in Texas two days before his February 27 arrest by Gary police. (*Id.* at 2). The government additionally stressed outstanding warrants for Sumbry's arrest in Wisconsin, Kentucky, and Georgia, and his multiple convictions and charges involving resisting arrest, evasion, escape from custody, and giving false information or aliases to police, one in Texas just five days before his February 27 arrest in Indiana. (*Id.* at 2, 4-11). Based on this history, the nature of the pending charges involving both firearms and ammunition, and Sumbry's multiple convictions for crimes of violence, the government requested his detention pursuant to § 3142(f)(2) based on both risk of flight and danger to the community that no combination of conditions could reasonably address.

Defense counsel's response to the government's proffer began by explaining that he had no previous information concerning the circumstances of Sumbry's federal arrest and needed to speak privately with Sumbry through the VTC, which the Court allowed. After this break, the Court asked whether counsel had adequate time to consult with Sumbry and counsel stated that he was ready to proceed. Sumbry's counsel then proffered that when Sumbry and Jones were approached by Gary Police on February 27, Sumbry went into a nearby residence where numerous people were inside and then exited that residence and walked over to the police vehicle. At that point, the police pulled their guns on him, and ordered him not to leave. Sumbry denied possessing any weapons, ammunition, or a gun holster at the time of his February 27 arrest; he further denied any knowledge of where Gary police reportedly located any firearms in the area of his arrest; and

he claimed he had no shotgun shells on him and that Gary Police never said anything to him about shotgun shells.[2] Sumbry also denied seeing or knowing about a shotgun or ammunition at the residence on Jennings Street where he was arrested by ATF agents on March 12, and questioned whether the agents had a warrant to search that residence when they located a shotgun and ammunition there.

Regarding his criminal history, Sumbry argued that it mostly took place when he previously lived in Georgia and was involved until 2017 in a "problematic relationship" with a woman who lived there, after which he relocated to Texas. Sumbry proposed residing with either Ms. Brown at her Gary residence on Jennings Street where he was arrested on March 12 (and where a shotgun and ammunition were found), with his mother elsewhere in Indiana (possibly Merrillville, though Sumbry did not know her address), or with his wife in Texas.

Considering all of the foregoing, this Court found the government met its burdens to show that Sumbry is both a risk of flight and danger to the community and that no condition or combination of conditions could reasonably assure his appearance as required or the safety of the community upon his release. (ECF No. 21). In so ruling, the Court acknowledged Sumbry's proffer denying possession of any firearms or ammunition at the time charged in the Complaint and Indictment or his March 12 arrest in this case, and the Court gave no weight to any conduct charged in Sumbry's criminal history that did not result in conviction. (*Id.* at 1). Nevertheless, the Court found the government's proffer regarding the instant charges involving firearms and ammunition and the presence of a firearm and ammunition at the time of Sumbry's March 12 arrest concerning,

---

[2] Defendant's counsel similarly argued that Gary police lacked probable cause to arrest him on February 27 because they detained him before any weapons were located, thereby rendering any weapon or ammunition later recovered inadmissible in both the state case against him and this case. That issue is now raised in a Motion to Suppress filed by Defendant on April 6, 2020 (ECF No. 22), on which this Court expresses no view. These issues were addressed at the original detention hearing to the extent they bore upon the strength of the government's case.

and noted his failures to appear and bond forfeitures. (*Id*.). Moreover, given Sumbry's multiple prior convictions for violent crimes (assault causing injury, among others), resisting and evading arrest, giving false information to law enforcement, and escape from custody, the Court concluded that no condition or combination of conditions could reasonably assure the safety of the community or Sumbry's continued appearance as required. (*Id*.). The Court therefore ordered Sumbry detained pending trial. (*Id*.).

## III.    Proceedings on the Instant Motion

Sumbry's motion sought to reopen his detention hearing pursuant to § 3142(f) based on additional information regarding the firearm and ammunition found at the Jennings Street residence where Sumbry was arrested by ATF agents on March 12. (ECF No. 24, ¶ 2). As noted above, Sumbry claims he was unaware of this evidence prior to the last detention hearing, and his motion and brief sought to offer testimony from Ms. Brown, who lives in that residence, that the shotgun and shells found there on March 12 belonged to her ex-husband and were unknown to Sumbry during his stay there (though as discussed below, Ms. Brown ultimately testified that the shotgun and shells were hers, not her ex-husband's). (*Id*; ECF No. 30, at 2-3). Sumbry's motion and brief also offered testimony from Ms. Brown that the jacket Sumbry was wearing when arrested on February 27 (in which Gary police found two shotgun shells in the pocket) belonged to her son. (ECF No. 24, ¶ 2; ECF No. 30, at 2-3). Sumbry's brief additionally claims other individuals were in the area where police found the two firearms Sumbry has been charged with possessing on February 27, which he says "certainly impacts the weight of the evidence against" him. (ECF No. 30, at 2-3). Additionally, Sumbry seeks temporary release pursuant to § 3142(i) based on reports of a COVID-19 outbreak at Porter County Jail where Sumbry is being detained, because his trial has been postponed as a result of the pandemic, and due to logistical difficulties

he has encountered conferring with counsel while in custody. (*Id*. at 3-5). He proposes home detention with GPS monitoring at Ms. Brown's Jennings Street residence. (*Id*.).

The government opposed Sumbry's release, arguing that Ms. Brown's testimony is insufficient to challenge the Court's prior detention ruling, and that Sumbry's remaining arguments regarding COVID-19 and access to counsel are likewise insufficient to warrant temporary release under § 3142(i). (ECF No. 31, at 5-10). The government's response also argued that Ms. Brown's residence is an inappropriate site for Sumbry's home detention given the weapons and ammunition already found there, and that such placement would present its own risk of exposure to COVID-19, given that Ms. Brown and/or her children have been leaving the home at times. (*Id*. at 7).

On April 27, 2020, the Court heard testimony from Ms. Brown regarding the jacket Sumbry was wearing on February 27, the firearm and ammunition found at her residence when Sumbry was arrested there on March 12, and her willingness to allow Sumbry to stay with her at that residence should he be released on electronic monitoring and/or home detention. Ms. Brown testified that she was Sumbry's girlfriend and that he and his five year-old daughter stayed at her home after they flew into Chicago two nights prior to Sumbry's February 27 arrest by Gary Police. According to Ms. Brown, Sumbry did not stay in her bedroom where the shotgun was later found, and instead slept on a couch in the living room where his daughter also slept. Ms. Brown said she gave Sumbry her oldest son's jacket to wear the night of February 27 because it was cold outside, and that the jacket was also worn by her children's father. According to Ms. Brown, after Sumbry was arrested by Gary Police and later released, he applied for and obtained a job in the area at the same manufacturer where Ms. Brown works so that he could remain in the area.

Regarding the shotgun and shells found in her home when Sumbry was arrested there on March 12, Ms. Brown stated that she moved the shotgun from a downstairs living room closet

where the gun was ordinarily kept and hid it in her upstairs bedroom while federal agents were knocking on her door to execute the arrest warrant for Sumbry. Ms. Brown stated the shotgun belonged to her, that she hid the gun because she did not know it was lawful for her to own a firearm, and that she lied to the agents on March 12 when she told them the gun was not hers because she feared getting in trouble for owning a firearm. According to her testimony, Ms. Brown now admits she owns the gun because she learned it was lawful for her to do so. She also stated that the shotgun shells found by ATF agents in her home on March 12 were located in the same living room closet where the shotgun was normally kept, and that Sumbry had no contact with or knowledge of the shotgun or shells before federal agents arrived that day.

Defense counsel also stated that Sumbry had now informed him that he had gone out to buy marijuana at a house on Jennings Street before being arrested on February 27, and Defense counsel offered a proffer from Ms. Brown's oldest son (Anthony), who claimed to be one of the individuals at that house that evening. According to this proffer, five 18-to-20-year-old men were at the house where Sumbry bought marijuana on February 27, they were "basically smoking dope," and "somebody was selling marijuana from the house." After Sumbry purchased his marijuana and left, he returned and informed the people inside the house that police were in the vicinity. All of the young men then ran out of the house to an area between two houses and jumped a gate, at which time someone dropped two firearms, one of them pink, consistent with one of the firearms later recovered by Gary Police.

The government next presented testimony from one of the agents who was present for Sumbry's March 12 arrest, ATF Agent Jones. According to this testimony, despite knocking on the door and announcing the presence of law enforcement, no one opened the door to Ms. Brown's residence, so agents made a forced entry. During a protective sweep, a shotgun was found in plain

8

view, and Ms. Brown told the ATF agents that she and Sumbry had been sharing the upstairs bedroom and that she did not own the firearm. Agent Jones also confirmed that a gun holster located in the living room closet in Ms. Brown's residence when Sumbry was arrested there on March 12 appeared identical to the empty holster that was reportedly attached to Sumbry's belt and recovered by Gary Police when Sumbry was arrested on February 27.

Defense Counsel also added to his earlier proffer from Sumbry, briefly discussing conditions in the Porter County Jail. He stated that despite making efforts to isolate those with COVID-19, there was a recent rise in the number of COVID-19 cases, and that Sumbry asked to be tested for the virus but was told no test was available for him because he was not exhibiting any symptoms. The Court also heard from a deputy United States Marshal regarding the presence of COVID-19 at the jail and measures taken to address it. The Deputy Marshal confirmed that 38 inmates had tested positive for the virus as of April 24, two inmates had recovered, and numerous measures have been taken to control further spread of the virus. New arrivals and any inmates that leave the jail and return for any reason (such as a doctor's appointment) are subject to a 14-day quarantine; and any confirmed or suspected cases of COVID-19 are further quarantined and tested, receive vital checks twice daily, are prescribed Tylenol for fever, and are transported to the hospital if needed. The jail has also increased cleaning to disinfect common areas and equipment twice daily, shut down its kitchen, ended its inmate worker program, and generally limited interaction to the extent possible. Inmates have also been given masks and disinfectants for their cells and additional soap to allow for more frequent handwashing.

Having considered all of the foregoing evidence presented at the April 27 hearing, the parties' briefs, and the arguments of counsel, the Court now addresses Sumbry's request for release under both subsections (f) and (i) of § 3142.

## ANALYSIS

### I.  Statutory Framework

The Bail Reform Act requires a detention hearing upon motion by the government in two instances: (1) when the case involves one of the offenses enumerated in subsection (f)(1), such as possession of a firearm; or (2) when there is serious risk the defendant will flee or obstruct justice, as described in subsection (f)(2). 18 U.S.C. § 3142(f)(1)(E), (f)(2)(A)-(B). In such cases, a hearing is required "to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community." *Id*. at § 3142(f). After the hearing, § 3142(e) requires detention if the Court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." The government bears the burden on both issues, by a preponderance as to risk of nonappearance and by clear and convincing evidence as to danger to the community. *Id*. at § 3142(f)(2).[3] Section 3142(g) lists the factors to consider when determining whether any conditions of release might reasonably assure the defendant's appearance and the safety of the community:

> (1) the nature and circumstance of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including-
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

---

[3] The government conceded during the March 30 detention hearing that there was no rebuttable presumption of detention under 18 U.S.C. 3142(e), and this Court found the same. (ECF NO. 21, at 1-2).

   (B) whether, at the time of the current offense or arrest, the person was on
   probation, on parole, or on other release pending trial, sentencing, appeal, or
   completion of sentence for an offense under Federal, State, or local law; and

 (4) the nature and seriousness of the danger to any person or the community that
would be posed by the person's release.

Equally pertinent here, § 3142(f) also allows for reopening a detention hearing "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." The Court regards Sumbry's newly submitted information from Ms. Brown regarding the ownership of the shotgun and shells found at her residence at the time of Sumbry's March 12 arrest, and the proffer from her son that others may have dropped firearms in the vicinity where Gary Police recovered the firearms Sumbry was charged with possessing on February 27, as potentially bearing on that issue. The Court therefore grants Sumbry's Motion to Reopen insofar as it seeks consideration of that information in relation to the issue of detention under § 3142(f). That is, the Court will consider all of this evidence in relation to the issue of whether any conditions of release will reasonably assure Sumbry's appearance as required and the safety of the community – and undertakes that analysis below.

Sumbry's evidence regarding COVID-19 cases at Porter County Jail is less relevant to the determination required under § 3142(f). As other district courts have observed, that provision "focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community." *United States v. Clark*, – F. Supp. 3d –, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020). "The risk of harm *to the defendant* does not usually bear on this analysis." *Id*. (emphasis in original); *U.S. v. Calvert*, No. 19-40068, 2020 WL 1847754, at *2 (D. Kan. Apr. 13, 2020) (collecting decisions

following *Clark*). That said, some courts have considered COVID-19 in their analysis under § 3142(f) to the extent it bears on any of the factors set out in § 3142(g), such as the history and characteristics of the defendant. *E.g.*, *United States v. Leake*, No. 19-cr-194, 2020 WL 1905150, at *2 (D.D.C. Apr. 17, 2020); *United States v. Hussein*, No. 29-mj-89, 2020 WL 1853656, at *3 (D. Minn. Apr. 13, 2020). Courts have also considered the pandemic insofar as it bears more generally "on whether conditions of release can be fashioned to assure the appearance of the defendant as required and the safety of the community." *E.g.*, *United States v. Duckett*, No. 19-cr-229, 2020 WL 1904745, at *4 (D. Md. Apr. 17, 2020); *United States v. Green*, No. 1:19-cr-539, 2020 WL 1873967, at *1 (D. Md. Apr. 15, 2020) (citing *United States v. Martin*, – F. Supp. 3d –, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020)). As explained below, this Court does the same.

In addition to such considerations under § 3142(f), "many courts have found that the determination of whether a defendant's circumstance warrants temporary release due to COVID-19 is more suitably considered on a case-by-case basis under § 3142(i)'s 'compelling reason' grounds." *E.g.*, *United States v. Hanson*, No. 19-132, 2020 WL 1692967, at *2 (D. Mont. Apr. 7, 2020) (citing *Clark*, 2020 WL 1446895, at *3); *see also United States v. Hernandez*, No. 3-19-CR-346, 2020 WL 1876102, at *2 (N.D. Tex. Apr. 14, 2020) (collecting decisions). Under this provision, a court "may" permit "temporary release" of a defendant "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Prior to the COVID-19 pandemic, defendants seeking release under subsection (i) typically did so for reasons relating to defense preparation, but courts also granted such relief "sparingly" under the "compelling reason" prong where a defendant had a serious illness or injury. *United States v. Andrewsh*, No. 5:19-mj-87, 2020 WL 1904473, at *4 (M.D. Penn. Apr. 17, 2020) (quoting *United States v. Lee*, No. 19-cr-298, 2020

WL 1541049, at *3 (D.D.C. Mar. 30, 2020)); *United States v. Hamilton*, No. 19-CR-54-01, 2020

WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020)). More recently, a "growing number of jurisdictions"

have considered requests for release relating to COVID-19 under the "compelling reason" prong

of § 3142(i). *Hernandez*, 2020 WL 1876102, at *3 (collecting decisions).

As these decisions recognize, the defendant bears the burden of demonstrating a sufficient

ground for release under § 3142(i). *Id.*; *Andrewsh*, 2020 WL 1904473, at *3. Even where such a

ground exists, however, release under § 3142(i) is subject to the court's discretion, as the provision

states that a court "may" release a defendant as necessary for defense preparation or another

compelling reason, not that release is required for such reasons. *United States v. Gumora*, No. 20-

CR-144, 2020 WL 1862361, at *9 n.10 (S.D.N.Y. Apr. 14, 2020); *United States v. Davis*, No.

2:19-cr-74, 2020 WL 1951652, at *1 (N.D. Ind. Apr. 23, 2020). Courts considering motions under

§ 3142(i) also agree that the determination of whether to release a defendant under that subsection

requires an "individualized" analysis of the facts of each case. *Gumora*, 2020 WL 1862361, at *5;

*Andrewsh*, 2020 WL 1904473, at *4; *Hussein*, 2020 WL 1853656, at *4. When addressing motions

seeking release due to concerns over COVID-19, many courts have considered four factors

articulated in *United States v. Clark* to guide that analysis: "(1) the original grounds for the

defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns,

(3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-

19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would

increase COVID-19 risks to others." *See Davis*, 2020 WL 1951652, at *1 (quoting *Clark*, 2020

WL 1446895, at *3).[4]

---

[4] *See also Andrewsh*, 2020 WL 1904473, at *4 (same); *Hussein*, 2020 WL 1853656, at *4 (same); *United States v. Haun*, No. 3:20-CR-24, 2020 WL 1847063, at *3 (E.D. Tenn. Apr. 10, 2020) (same); *United States v. Hamlin*, No. 17-cr-175, 2020 WL 1703848, at *5 (E.D. Wis. Apr. 8, 2020) (same); *Hanson*, 2020 WL 1692967, at *2 (same).

As discussed below, this Court considers these factors helpful when considering the text of the statue and therefore considers them as well, along with the additional concerns Sumbry has raised regarding the postponement of his trial and the difficulties he has encountered conferring with his counsel while in custody.

## II.        Sumbry's Request for Release Under Section 3142(f)

The Court turns first to Sumbry's request for reconsideration of its initial detention determination based on Ms. Brown's testimony at the April 27 hearing that that the shotgun and shells found at her residence when Sumbry was arrested there were unknown to him at the time. According to Sumbry, this lessens any concern about his danger to the community should he be released. (ECF No. 24 ¶ 2). But this new information does nothing to alter the Court's prior conclusion, which expressly acknowledged Sumbry's proffer denying possession of any weapons or ammunition at the times charged in the criminal Complaint or when he was arrested on March 12. (ECF No. 21, at 1). In fact, the Court placed no particular reliance on the circumstances of Sumbry's arrest on the federal charges, except to note that he was found in close proximity to a firearm and ammunition. But as the Court explained, even assuming they belonged to someone else, the combination of Sumbry's violent criminal history and tendency to return to situations where firearms and ammunition are accessible presents a serious danger to the community which no conditions of release can reasonably address. That reasoning still applies, even accepting Ms. Brown's testimony that she owned the shotgun and shells found in her residence, and regularly stored them in a closet in the same living room where she claims Sumbry was sleeping.

The additional information Sumbry offers about his February 27 arrest also fails to tip the balance. Specifically, Ms. Brown claims Sumbry was wearing her son's jacket without knowledge of the shotgun shells in the pocket, and Sumbry claims others were in the area where Gary Police

14

found the guns he is charged with possessing that day. (ECF No. 30, at 2-3). Citing *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020), Sumbry argues this information "impacts the weight of the evidence against Mr. Sumbry," and combined with concerns raised by the current COVID-19 pandemic, tips the balance against detention. (ECF No. 30, at 5). *Stephens* was different, however, as it involved a change in the arresting officer's account of whether the defendant (who had no other violent history) possessed the firearm at issue. 2020 WL 1295155, at *1-2. Here by contrast, the new information comes from Sumbry and his girlfriend, not an arresting officer. Moreover, the information they offer once again fails to alter the Court's prior analysis for the same reasons explained above. While the Court acknowledged Sumbry's proffer denying the instant charges, it nevertheless found the government's proffer and the pending charges consistent with Sumbry's criminal history, including "crimes involving violence, a willingness to lie to law enforcement and resist law enforcement, and an escape from custody." (ECF No. 21, at 1). That consistency remains, particularly given the empty holster Sumbry was reportedly wearing when arrested on February 27 and the reportedly identical holster located when he was again arrested on March 12. (ECF No. 1, ¶ 7; ECF No. 31, at 7).

This is not to say that none of the evidence presented at the April 27 hearing moved the scales in Sumbry's favor, but any such movement was minimal. Of course, Sumbry's new claim that he wasn't wearing his own jacket when arrested by Gary Police and therefore didn't know about the ammunition in its pocket was clearly known to him at the time of the initial detention hearing in this case. Although Sumbry may not have realized there was a witness to corroborate this claim, he certainly would have known the jacket didn't belong to him. Yet, despite having time to confer with counsel during a private session on the VTC system, and the opportunity to give a proffer not subject to cross examination, there was no mention that he was wearing another

15

person's jacket. As an initial matter, the Court questions whether this is truly information "not known to the movant" at the initial detention hearing that allows for reconsideration of detention. § 3142(f). Nevertheless, since the Court is considering other evidence that is new, such as Ms. Brown's claim that she owned the firearm found in her home at the time of Sumbry's March 12 arrest and the proffer of her son regarding others who may have the dropped weapons Sumbry is charged with possessing on February 27, it will consider all of the evidence from the April 27 hearing, including Ms. Brown's testimony that she lent Sumbry her son's jacket before he was arrested on the night of February 27. But still, these new claims fail to challenge the government's evidence in any meaningful way for several reasons.

While Sumbry's claims – that the ammunition he is charged with possessing was in someone else's jacket, that others may have dropped the firearms he is charged with possessing, and that he did not own or know about the shotgun found where he was arrested – might shift the balance in a vacuum, those claims must be considered in the context of other facts that contradict them.[5] Sumbry's claim that he was wearing another's jacket on February 27 and therefore unaware of the ammunition in its pocket must be considered along with his failure to mention that beneficial fact during the initial detention hearing. His claim that others dropped both of the firearms he is now charged with possessing on February 27 must be considered along with the evidence indicating he was then wearing an empty holster which matched another holster found where Sumbry was staying. And while the weight of Ms. Brown's testimony is for a factfinder to determine on another day, this Court must additionally consider that she identified Sumbry as her boyfriend and admitted lying to federal agents about the ownership of the shotgun also found at

---

[5] Sumbry has no burden under § 3142(f) at a detention hearing, and of course is entitled to present no evidence at all. However, having presented evidence, including proffers, the Court must consider and weigh Sumbry's proffers and other evidence.

her home when Sumbry was arrested there. The new information Sumbry offers therefore fails to alter this Court's conclusion that the factors set out in § 3142(g) – the nature of the instant charges, the weight of the evidence against him, his history and characteristics, and the nature and seriousness of the danger posed by his release – all point toward detention.

Sumbry's criminal history alone (of assault, battery, family violence, evasion, and escape) establishes not only danger to the community, but a risk of flight that even he has not disputed. Thus, while the Court has reweighed the § 3142(g) factors considered at Sumbry's initial detention hearing and considered whether any of the new evidence could call for a different conclusion, the balance has not changed much, if at all. Any slight change in Sumbry's favor in relation to the weight of the evidence against him is more than offset by the compelling nature of his history and characteristics, which include a criminal history that goes directly to his danger to the community and poor record of appearing at court proceedings as required. Although the nature of the instant charges of possessing a firearm and ammunition as a felon is perhaps not as serious as some violent offenses, the nature and circumstances of his crime also weigh in the government's favor, particularly when one considers the risk a firearm poses in the hands of someone with Sumbry's criminal history. In short, Sumbry's criminal history coupled with his crime of possessing a firearm militate strongly against his release.

Nor does the current pandemic cast doubt on the Court's conclusion that detention is required. Regardless of whether Sumbry's release would reduce or increase his chance of infection, that possibility does nothing to reduce the risk of danger and flight posed by his release. If anything, the pandemic renders conditions to address those risks less feasible. That is because Sumbry's multiple convictions for family violence cause even greater concern over confining him at the home of his girlfriend and her four children (where firearms and ammunition have been

accessible in the past), at a time when they are less able to seek solace elsewhere because citizens are asked to shelter in place. And Sumbry's claim that a "problematic relationship" in Georgia led to many of his arrests does little to lessen that concern, as that engenders little if any confidence that he has accepted his responsibility for felony crimes of domestic violence or many unrelated crimes. The difficultly of protecting the public with conditions of release from someone who has engaged in the conduct for which Sumbry has been convicted is self-evident. His crimes occurred both inside the home and in public. Such crimes could again occur if he were released to a domestic setting, asked to return to court, or placed back in custody. In fact, although Sumbry did not flee after being released on bond on the state gun charges related to his recent arrest, which was one factor weighing in his favor, neither he nor anyone else in Ms. Brown's residence answered law enforcement when they were attempting to serve a federal warrant there, requiring the agents to enter forcibly. While other facts surrounding his March 12 arrest on federal charges were disputed, this was not. And for someone on bond for another charge (and with many outstanding warrants) this creates real concerns that Sumbry will appear as required.

To be clear, none of this should suggest this Court's indifference to the risk Sumbry might contract COVID-19 while in custody, only that the initial issue of detention is unaffected by that calculus. That prospect bears instead on Sumbry's request for temporary release pursuant to § 3142(i), which is addressed separately below. While the challenges we all face with COVID-19 will mean some defendants are less dangerous, or that conditions could reasonably protect the public from them, that is not so for Sumbry. With less traffic and human interaction in the current environment, some defendants' criminal history and/or the charges they face will take on a new light in relation to the factors the Court must consider in attempting to fashion conditions of release. But Sumbry was convicted of multiple violent felonies and regularly failed to appear in

18

Court. Although many of his crimes were somewhat petty, some were not, and he repeatedly created a danger to family members, the general public, and law enforcement. That danger and his obvious risk of flight clearly call for detention under § 3142(f).

## III.     Sumbry's Request for Release Under Section 3142(i)

Since § 3142(f) still calls for detention, the Court turns to Sumbry's request for temporary release under § 3142(i). That provision allows the "temporary release" of a defendant detained under the Bail Reform Act to the custody of a United States Marshal "or another appropriate person" when "necessary" for a "compelling reason." 18 U.S.C. § 3142(i). As discussed above, when considering requests for release under § 3142(i) for reasons related to COVID-19, many courts have considered what are now known as the *Clark* factors: "(1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others." *Davis*, 2020 WL 1951652, at *1.

On the other hand, some courts have found it unnecessary to consider the *Clark* factors where (as here) a defendant presents no underlying health issues that increase his risk for serious complications from COVID-19. *See*, *e.g.*, *United States v. Rankins*, No. 1:20-CR-81, 2020 WL 1939613, at *4 (M.D. Penn. Apr. 22, 2020) ("Cases construing § 3142(i) generally 'have rejected emergency motions for release of otherwise healthy and potentially violent defendants based solely on the generalized risks that COVID-19 admittedly creates for all members of our society.'") (quoting *Lee*, 2020 WL 1541049, at *6, and collecting decisions). This follows from the statute's requirement of a "compelling reason" for release, and its historical application "sparingly" only where the defendant was suffering from a serious injury or illness: "the very

nature of the standard prescribed by statute–which requires a showing of some 'compelling reason' to warrant temporary release from custody–suggests that such motions must meet exacting standards and 'the few courts that have ordered temporary release on the basis of such a condition have done so only 'sparingly' and typically in order 'to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries.'" *Rankins*, 2020 WL 1939613, at *3 (quoting *Lee*, 2020 WL 1541049, at *3). Nevertheless, Sumbry is entitled to an individualized review of his circumstances at Porter County Jail, so the Court proceeds to consider the *Clark* factors, which also call for his detention.

Regarding the first *Clark* factor, the original grounds for Sumbry's detention were strong, as discussed above. The second factor looks to the specificity of the defendant's COVID-19 concerns, and Sumbry points only to an increasing number of positive cases of the virus among inmates at the jail. (ECF No. 30, at 3). But as several courts have stated, "mere presence of the virus, even in the detention setting, does not automatically translate to the release of a person accused." *Andrewsh*, 2020 WL 1904473, at *5 (quoting *United States v. Williams*, No. 19-8, 2020 WL 1643662, at *2 (D. Md. Apr. 2, 2020)); *Duckett*, 2020 WL 1904745, at *6 (quoting *United States v. Ray*, No. 19-215, 2020 WL 1849764, at *1 (D. Md. Apr. 13, 2020)). "Merely casting numbers about the rising infection rate, without more, is not helpful." *Ray*, 2020 WL 1849764, at *2. "Far more important, is the ability of facilities – whether hospitals, nursing homes or detention centers – to reasonably respond to the burdens the pandemic creates in their respective settings." *Id*. And the evidence here demonstrates that Porter County Jail is taking meaningful measures to combat further spread of the virus within that facility, including quarantines of new and returning inmates and confirmed and suspected COVID-19 cases, reduced interaction throughout the jail, increased cleaning of common areas and equipment, and providing inmates

with masks and additional cleaning supplies and soap for handwashing. *See also United States v. Carrington*, No. 19-cr-59, 2020 WL 2029391, at *3 (N.D. Ind. Apr. 28, 2020) (discussing measures taken to address COVID-19 at Porter County Jail).[6]

The third *Clark* factor also weighs in favor of detention. Sumbry's release plan fails to mitigate other COVID-19 risks and may even exacerbate such risks, by placing him with five other people, two of whom (Ms. Brown and her oldest son Anthony) are working outside the home. Sumbry has failed to explain how his release plan would provide any medical treatment currently unavailable to him should he contract the virus, whereas inmates at the jail who have contracted COVID-19 are monitored and have their vitals checked twice daily, given Tylenol for fever, and transported to a hospital if needed. Similarly, Sumbry's release plan fails under the last *Clark* factor, since he might risk exposure of COVID-19 to others by spreading it from the prison to the five people now living in Ms. Brown's house and anyone else he comes in contact with. In other words, Sumbry would be "socially mixing, when everyone else is social distancing." *United States v. Dewitt*, No. 3:19-CR-158, 2020 WL 1917340, at *3 (W.D. Ky. Apr. 20, 2020). And this risk is all the more problematic here, given Sumbry's propensity to evade law enforcement and the corresponding likelihood that he will not adhere to house arrest. *See, e.g., Haun*, 2020 WL 1847063, at *5 (noting the increased risk that a defendant with a poor track record of complying with conditions of probation or release will potentially spread COVID-19); *Hanson*, 2020 WL 1692967, at *3 (same).

---

[6] During the April 27 hearing, Sumbry argued that COVID-19 cases at the jail may have nevertheless increased while these measures have been in effect. Perhaps so; the Court has no information in that regard. But as the court observed in *Ray*, the same is true across the country: "For months, medical experts have universally and correctly predicted that the raw numbers of those who would be infected would multiply. This fact has borne true no matter where in the country the virus has appeared." 2020 WL 1849764, at *2; *see also Green*, 2020 WL 1873967 ("the Court cannot conclude from a rising number of positive cases that the measures being taken are inadequate" when the same is true "in the community at large"). The measures taken by Porter County Jail must be assessed for their reasonableness under the circumstances, and even Sumbry has not argued that those measures should or could be improved.

Finally, Sumbry cites the delay of his trial and certain recent difficulties communicating with his counsel, both caused by COVID-19, as additional grounds for his release. (ECF No. 30, at 5). Neither suffices under § 3142(i), alone or in combination. As for the continuation of his trial, Sumbry's statutory and constitutional right to a speedy trial are being well respected. Specific findings have been made as to the calculation of the Speedy Trial Act (ECF Nos. 14, 25), and the Court's General Orders have been based upon unprecedented circumstances and the need to protect potential jurors, among others. (*See* General Order Nos. 2020-05, 2020-06, and 2020-10, entered on March 17, 2020, March 18, 2020, and April 9, 2020, respectively). And in any event, Sumbry's pending Motion to Suppress has tolled the Speedy Trial Act clock wholly apart from any delay caused by COVID-19. *See* 18 U.S.C. § 3161(h)(1)(D).

Sumbry's difficulty communicating with his counsel also falls short. For one thing, as Sumbry argues, all cases have been postponed. "Thus, at least at this time, temporary release is not justified on the basis of preparation of his defense." *See Green*, 2020 WL 1873967, at *3. Additionally, Sumbry's counsel acknowledged at the April 27 hearing that he was recently able to resolve his issues with attorney client communication; and as the government argues (ECF No. 31, at 9), Sumbry's ability to prosecute the instant motion and his motion to suppress demonstrates that he is being well represented under these unique circumstances. Moreover, this Court takes the need for such communication seriously, and has ensured during past telephonic status conferences that counsel was able to communicate effectively with his client. The Court will continue to do so, and will address any future communication difficulties, upon motion of counsel. Given these protections, Sumbry's need to communicate with counsel, which would likely be hampered by COVID-19 even if he were not in custody, provides no reason to release him.[7]

---

[7] *See United States v. Bilbrough*, No. 20-33, 2020 WL 1694362, at *4 (D. Md. Apr. 7, 2020) ("although attorney-client communications may be more challenging under the present circumstances, the Court will take necessary steps,

**CONCLUSION**

This Court's task is to consider the current set of facts under two subsections of § 3142: (f), as it relates to a reconsideration of whether any conditions or combination of conditions might reasonably assure the safety of the community or Sumbry's appearance as required; and (i), to determine if release is necessary for preparation of Sumbry's defense or another compelling reason. Perhaps COVID-19 urges forcefully or irresistibly for action where a defendant's detention was a closer call or not based on the type of criminal history discussed above. And perhaps the virus might require release in another context, but not where the grounds for detention are themselves very compelling and any claimed reason for release speculative at best, considering Sumbry's overall health and the proactive measures taken by the Porter County Jail.

For the foregoing reasons, the Court hereby **GRANTS** Defendant Joseph Sumbry's Motion to Reopen Detention Hearing [DE 24] and reconsiders the Court's prior Detention Order [DE 21] based on the evidence and arguments identified in Defendant's Motion, the parties' briefing, and the evidence and argument presented at the April 27 hearing, but **DENIES** Defendant's request for release under 28 U.S.C. § 3142(f) and (i).

So ORDERED this 1st day of May, 2020.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT

---

between now and trial, to facilitate defense counsel's ability to have sufficient opportunities to meet with Bilbrough, in person or electronically"); *United States v. Terrone*, No. 3:19-CR-58, 2020 WL 1844793, at *12 (D. Nev. Apr. 10, 2020) ("The court is sympathetic to the circumstances surrounding Terrone's ability to communicate with counsel during the pandemic while housed at WCDF, but to the extent these limitations exist while he is detained, they will almost certainly exist if he is released.").