UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:20-cr-35-PPS |
| ) | |
| JOSEPH SUMBRY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Defendant Joseph Sumbry has been charged with three counts of violating 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm. [DE 51.] Sumbry has moved to suppress all evidence seized by law enforcement during two separate incidents leading up to his being charged in this case. [DE 22.] Specifically, he seeks to suppress a holster and ammunition which were on his person when he was stopped and frisked by police, as well as two handguns recovered from a nearby area, although not on his person or property. He further argues that a shotgun and ammunition recovered from the home in which he was arrested should also be suppressed.

On July 13, 2020, I held an evidentiary hearing on the motion to suppress and heard testimony from law enforcement officers involved in the investigation, as well as from Sumbry's girlfriend and her son who were present at the time of Sumbry's arrest. [DE 57.] For the reasons discussed below, I find no violation of Sumbry's rights under the Fourth Amendment of the United States Constitution from either incident.

## Background

The factual record in this case is based on the testimony and exhibits from the evidentiary hearing held on July 13, 2020. [DE 57.] Testifying at the hearing were Gary Police Officers Nicholas Sanchez and Jason McCoy, who responded to a shots-fired call on the evening of February 27, 2020; ATF Agent Matthew Jones who executed an arrest warrant for Sumbry two weeks later; and Devin Brown and Anthony Brown, Sumbry's girlfriend and her son, who lived in the home and were present the day Sumbry was arrested. [DE 58.] Here's what happened.

At approximately 7:30 p.m. on February 27, 2020, Officers Nicholas Sanchez and Jason McCoy were on patrol in their vehicle when they received a "shots-fired" emergency call in the vicinity of 23rd and Jennings Street in Gary, Indiana. As they approached the area a few minutes later, they observed only two individuals, both men, out on the street. The men would later be identified as defendant Joseph Sumbry and another man named Andre Jones. They were the only individuals the officers saw in the area. The two were walking on the sidewalk on 23rd Street before turning on Jennings. Officers Sanchez and McCoy approached the men in their police vehicle with their windows down. Officer Sanchez testified that when responding to a shots-fired call, a frequent occurrence while patrolling in Gary, it was his custom to keep the windows of his car down so that he could better hear in case there are additional gunshots.

Once they were within earshot of the two men on the sidewalk, while still in their vehicle, Officer Sanchez asked Jones and Sumbry if they had heard the reported

gunshots. Jones responded that he had not heard anything. Sumbry did not respond and instead walked away from the police without saying anything. Officer Sanchez asked Jones "what's up with your boy?" referencing Sumbry, and Jones responded that Sumbry did not "fuck with police." Sumbry continued walking away and went between two houses which were off the sidewalk where Jones and the police were talking.

At that point, the officers continued down the street in their car. They testified that they were preceding at a slow crawl or only a few miles per hour as they were still looking and listening for potential leads relating to the shots-fired call. As they were driving down the street, roughly 50 feet from where they had spoken with Jones, with the windows of their car still down, Officer Sanchez testified that he heard metal hitting concrete. To him it was the unmistakable sound of a gun hitting the concrete—a sound he said he was familiar with because occasionally other officers would drop their guns on the concrete ground (presumably by accident) at the shooting range used by the Gary Police Department. Officer McCoy, who was driving the car, testified that he did not hear anything. A few moments later, Officer Sanchez says he saw, in the car's side mirror, Sumbry emerge from between the two houses he had earlier walked between. Officer Sanchez observed Sumbry walk up and rejoin Jones on the sidewalk. This made Officer Sanchez suspicious of Sumbry.

At that point the officers got out of their car and approached Jones and Sumbry. They ordered the pair to come over to the car and Sumbry and Jones were placed in handcuffs and placed up against the car. Officer Sanchez proceeded over to the area

-3-

between the two homes where he had observed Sumbry walk to and then emerge from shortly thereafter. There he found two firearms, both handguns, one in the snow up against a fence and the other on a concrete walking path between the two houses.

While Officer Sanchez was searching the area between the two houses, Officer McCoy patted a handcuffed Sumbry and Jones down. Officer McCoy found a handgun holster on Sumbry's belt and two shotgun shells in his coat pocket. Sumbry was taken into custody and charged in Lake County Criminal Court with being a felon in possession of a gun. A day and a half later, he posted bond and was released.

In the meantime, ATF and the United States Attorney became involved. On March 4, a federal criminal complaint charging Sumbry with two violations of 18 U.S.C. § 922(g)(1), one for a firearm and another for the ammunition, and a warrant for his arrest was issued. Federal agents sought to execute the arrest warrant that same day at the home of Devin Brown, Sumbry's girlfriend and with whom he was staying. They knew Sumbry was at this residence (located near down the street from the site of his original arrest) because agents surveilling him saw him get out of a car with another female and enter the home that morning. After he entered the home, police continued to surveil the area to ensure that no one else went in or out of the home.

Roughly 30 minutes later, at approximately 11:50 a.m., a contingent of 10-12 ATF agents arrived at the home. ATF Agent Matthew Jones was leading the operation and conducted a knock and announce at the front door. He banged on the door and loudly identified himself by shouting, "Police with a warrant." After approximately two

-4-

minutes of knocking and waiting, no one answered the door. Agents then broke open the lock on the door and entered the home. They immediately encountered Sumbry and individuals they later identified as Sumbry's girlfriend and her 18-year-old son. Agent Jones testified that it was a small home and that individuals were in the living room and kitchen area which was the immediate area upon entry into the home. Sumbry was placed in handcuffs and taken outside of the home.

Other officers remained in the home and performed a sweep of the home to see if there were any other individuals in the home. No one else was found. Some of those officers went upstairs and looked in the bedrooms located on the second floor of the small "A-frame" house. In one of the bedrooms, there was a portion of the drywall near one of the beds smashed in. Agent Jones testified that the agents performing the protective sweep then came downstairs and told him they saw what they thought was a shotgun in the smashed-in part of the wall. The shotgun was in plain sight; the agents did not have to look deep into or inspect the smashed in portion of drywall to see it. Agents apparently photographed the weapon where they saw it but did not touch or seize it at that time. (Although no photographs of the shotgun were shown at the evidentiary hearing.)

Agent Jones testified that he then took Ms. Brown into the kitchen to speak with her. He says he read her a consent to search form and gave her an opportunity to read it herself. The form is a standard-issue consent to search. It identified the house by address and stated that Ms. Brown had the right to refuse the search, right to consult

with an attorney, that she may withdraw her consent to search at any time, and that any contraband or evidence of a crime discovered during the search may be seized. Agent Jones testified that Ms. Brown did not ask any questions about the form and she readily signed it. He further testified that he asked Ms. Brown about any guns in the home and she told him "something to the effect that she does not own guns and she did not know anything about" a firearm in her home. The agents then searched the home and removed a Cobra 12-guage shotgun from the portion of the drywall referenced earlier. The agents also seized a handgun holster and two types of ammunition found in a closet near the front door.

     Ms. Brown's testimony about how things happened was largely in line with Agent Jones's testimony, with a few key differences. She testified that she did not hear the agents knocking on her door prior to their entry because she was upstairs in her bedroom with Sumbry at the time. She further testified that when she was signing the consent to search form, she did not think she was consenting to have her house searched but only to having the shotgun removed from the house. Nonetheless, she admits she reads and writes the English language, but she says that she did not read the consent to search form carefully because she was scared. There was no other evidence of any undue pressure or other coercion.

     Ms. Brown gave other testimony that was inconsistent. She testified that she was in her bedroom and did not hear knocking at first but only eventually and that by the time she came downstairs to see what the knocking was about the ATF agents were

already inside. But at the same time, she also testified that after hearing the knocks, instead of answering the door, she took the shotgun and placed it in the smashed in portion of her drywall. She testified that the gun was hers and that it had been stored in a closet on the main level in her house. She testified that she kept no other ammunition besides shotgun ammunition in her home—although police recovered .32 caliber handgun ammunition from that same closet.

In a change from her prior statements, she testified that when the ATF agents entered her home, she lied and said the shotgun was not hers. But at the evidentiary hearing, she claimed the shotgun and at least one of the other guns was hers—although she testified she did not know how it ended up where it was between homes when it was recovered weeks earlier by officers McCoy and Sanchez. She testified that she purchased the guns illegally as well but did not offer other details about how she acquired them.

The other person present was Ms. Brown's 18-year-old son, Anthony. He also testified at the hearing. He testified that he was in his bedroom and eventually heard knocking and that when he went into the living room the ATF agents entered the home shortly thereafter. His testimony concerning the search of the home did not materially differ from the other witnesses, but Anthony testified that he kept ammunition in the front closet and that his mother kept a shotgun in her room. He further testified that on the evening Sumbry was originally arrested on the street, he had been with Sumbry shortly before. He testified that Sumbry came into his friend's house where he'd been

staying and told him, as a warning, that police were in the area. Anthony testified that in response to the warning, he ran from the house and jumped over a gate to go between the houses. He said that he dropped his pink 9 mm handgun he had tucked in his waistband without a holster. He apparently didn't pick the gun up or look for it but kept running. His description of the gun matches one of the guns that police found in the area shortly thereafter, and which Sumbry is charged with being a felon in possession of.

## Discussion

The Fourth Amendment to the United States Constitution states that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. When that right is violated, for example, when police conduct an unconstitutional search, a frequent remedy is to suppress any evidence obtained through the illegal search. *See Davis v. United States*, 564 U.S. 229, 237 (2011) (discussing remedies for Fourth Amendment violations). But one of the key words in the Fourth Amendment is "unreasonable." That is because reasonable—and thus constitutional—searches include those which may occur without a warrant under certain limited circumstances. In order to determine whether a such a set of circumstances existed at the time of a search or seizure, I must make factual findings based on the evidence presented in the parties' written submissions and at an evidentiary hearing. When evidence is presented through live testimony, a district court is given wide latitude to assess witness credibility and

resolve inconsistencies between testimony. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985).

Sumbry's motion raises a host of questions under the Fourth Amendment: Was the stop and frisk on the street reasonable? Were the guns found between the two homes abandoned property? Was the original protective sweep of the house while executing the arrest warrant reasonable? Was the shotgun found in the upstairs bedroom in plain view? And did Ms. Brown knowingly and voluntarily consent to the search of her home? These issues are all dealt with below.

### A. The *Terry* Stop and Discovery of Two Firearms Between Two Homes

The first issue to address is the stop and frisk of Sumbry by police on the street. When he was patted down, police found ammunition in his jacket and a holster, which is the evidence he seeks to suppress. This sort of temporary detention and cursory search in public is what is known as a *Terry* stop, based upon the seminal Supreme Court case of *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). In that case, the Court held that police have authority to stop and question a person if they have reasonable suspicion that they are engaged in criminal activity. *Terry*, 392 U.S. at 21-22. In deciding whether reasonable suspicion exists, courts examine the totality of the circumstances to answer whether police "ha[d] a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). But that inquiry only focuses on whether it is permissible for police to stop and temporarily detain them. In order to go further and conduct a frisk or pat down of a

person's clothing, police must "point to specific and articulable facts" indicating "that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 21, 24–25. "It is precisely because a frisk is more intrusive than a stop that the Fourth Amendment compels this additional armed-and-dangerous inquiry." *United States v. Howell*, 958 F.3d 589, 598 (7th Cir. 2020).

The type of call that brought the police to the scene matters greatly in the reasonableness inquiry. As *Howell* implicitly recognized, there is more likely to be reasonable suspicion when police are responding to a situation involving an ongoing crime or emergency involving potential violence—such as a "shots-fired" call as was the case here. *Howell*, 958 F.3d at 599 ("Consider, too, the nature of the reported offense. A call to police is less likely to support reasonable suspicion in the *Terry* analysis when it does not describe an ongoing crime or emergency.") In *Howell* it was held there was no reasonable suspicion for a pat down because "[n]othing about [the situation] suggested that an emergency was underway or that anybody was in imminent danger. Not a word was said about weapons, an injured victim, or anyone being threatened. The alleged offense took place around noon—in broad daylight—and the record is devoid of any evidence that it took place in a high-crime area." *Id.*

Here, the almost exact opposite is true. It was after dark, there were reports of gunshots, and in the immediate aftermath of those, there was a likelihood that an emergency was afoot. What's more, Sumbry and Jones were the only two people present in the location where the shots fired call was reported. That fact, coupled with

Sumbry's suspicious behavior in avoiding the police plus the sound of what Officer Sanchez recognized as a gun hitting a sidewalk, provided reasonable suspicion for police to briefly detain Sumbry and conduct a limited pat-down of his outer clothing.

The fact the police handcuffed Sumbry as part of the *Terry* stop does not fundamentally alter the equation. I agree that the routine use of handcuffs begins to blur the line between an arrest (which requires probable cause) and a *Terry* stop (which only requires reasonable suspicion), but the fact remains the use of handcuffs is not the *sine qua non*. "Their use is not always unconstitutional, though, at least where police officers can point to specific reasons for believing that handcuffing the particular person during the stop was needed for safety or to prevent flight." *United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013) (quoting *Ramos v. City of Chicago,* 716 F.3d 1013, 1018 (7th Cir. 2013)). I don't like and do not condone the unnecessary use of handcuffs in every *Terry* stop. But here, there was a legitimate potential threat given the nature of the call police were responding to, the time of day, and Sumbry's attempts to evade officers just prior to being ordered stop. Nor would the use of the handcuffs result in suppression of the evidence anyway. As the Seventh Circuit has previously held, "[E]ven if the use of handcuffs might have been unconstitutional, that would not require suppression of the evidence. The application of handcuffs increased the severity of the seizure but did not prolong it or permit the discovery of evidence that would not have been discovered otherwise." *Id.* Such was the case here where the ammunition and holster were found within seconds of Sumbry being handcuffed.

In sum, the ammunition seized from Sumbry's person will not be suppressed. It was the product of a valid *Terry* stop based on reasonable suspicion.

The next issue relates to the seizure of the two guns found between the two homes where Sumbry was seen walking from. The two firearms in question were not recovered directly as a result of the *Terry* stop of Sumbry and were not found on his person. They were discovered on the concrete and in the bushes between two houses—an area that police had just moments before seen Sumbry walk to, and then leave shortly thereafter. And during the time he was between the two houses, Officer Sanchez testified that he heard metal hitting concrete, which in the moment he thought was likely the sound of a gun hitting the sidewalk. Thus, while there's some possible connection between the guns and Sumbry, they were not in his physical possession at the time the police found them.

"Abandoned property is not subject to Fourth Amendment protection." *United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960)). "To demonstrate abandonment, the government must establish by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item searched or seized." *Id.* (citation omitted). "We look at the totality of the circumstances, but pay particular attention to explicit denials of ownership and to any physical relinquishment of the property." Here, it isn't clear whether Sumbry is actually challenging the seizure of these two guns—he

-12-

certainly does not claim they were his or in his possession. But in any event, all of the objective facts here point to them being abandoned when Officer Sanchez found them. It is thus akin to one of the "general types of cases" of abandonment recognized by the Seventh Circuit. *Basinski*, 226 F.3d at 837 ("[A] fleeing defendant who relinquishes an object to make his flight easier or because discarding the item might make it easier for him to later claim that he never possessed it [has abandoned the property] … [b]ecause he has disposed of the property in a location that affords easy access to the public, a reasonable person would believe that the defendant's possessory interest in the property is so eroded that anyone has a right to retrieve it."). As such, the two handguns recovered on February 27 will not be suppressed.

### B. The Searches of the Home Where Sumbry Was Arrested

The next set of issues deal with what happened a couple weeks later when ATF got involved and executed the arrest warrant of Sumbry in Ms. Brown's home. There are two distinct issues raised. The first is whether the initial search of the home (which the Government contends was a "protective sweep" incident to arrest) was constitutional; and the second is whether Ms. Brown's consent to search was validly obtained, making the larger and more invasive search of her home constitutional. I'll address each in turn.

The agents had a valid arrest warrant of Sumbry but they did not have a search warrant to search the house. And "searches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Cole*, 195 F.R.D. 627, 631

(N.D. Ind. 2000) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 748-49 (1984)). But an exception to the presumption exists for so-called protective sweeps done in conjunction with the execution of an arrest warrant. "A protective sweep is a quick and limited search of premises conducted to protect the safety of police officers or others." *United States v. Starnes*, 741 F.3d 804, 807–08 (7th Cir. 2013) (citing *Maryland v. Buie,* 494 U.S. 325, 327 (1990)). "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337. "The search must be cursory, lasting no longer than is necessary to dispel the reasonable suspicion of danger. It must also be limited to a cursory visual inspection of places where a person might be hiding." *Starne*, 741 F.3d at 808 (citations omitted).

The facts supporting the validity of the protective search are several and particularized. First, the ATF agents executing the arrest warrant were arresting Sumbry for being a felon in possession of a firearm. Thus, it was reasonable to think there might be additional firearms in the home. And law enforcement was by this time familiar with Sumbry's lengthy criminal history which includes violent felonies and numerous firearm offenses. Second, law enforcement saw Sumbry and Ms. Brown enter the home 30 minutes before they served the arrest warrant. Continued surveillance of the house indicated no one had left the premises in the meantime. So, when after two minutes of knocking and announcing the presence of police with a warrant no one

answered the door, the agents were reasonably on heightened alert, thereby justifying the need to ensure there was nothing dangerous afoot. Third, agents knew two people were in the home, but when they entered, there were at least three adults present (Sumbry, Ms. Brown, and her 18-year old son). It was thus reasonable to do a cursory search of the adjoining rooms and areas of the house to look for any additional persons. Finally, the officers seem to have conducted their search in relatively quick fashion and they did "not need to open cabinets or drawers or touch anything" to discover the shotgun—which seems was hastily (and poorly) hidden by Ms. Brown after she heard police outside her home. *Starnes*, 741 F.3d at 808.

Weighing against the validity of the protective sweep is the fact that it seems highly unlikely that someone was hiding inside the drywall where the police spotted the shotgun. But the evidence wasn't that they looked inside the smashed-in portion of the wall, only that the shotgun was in plain-sight. Likewise, the fact that agents photographed the gun as part of their "protective sweep" somewhat belies the notion that they were only doing a protective sweep—photographing suspected illegal weapons seems a lot more akin to evidence gathering. But without clear evidence to rebut the reasonable facts offered by agents justifying the search, such as Ms. Brown testifying that when she hid the gun in the drywall she fully concealed it or the photograph in question contradicting the agents, I take the agents at their word. On balance, the totality of the circumstances points to this being a valid, protective sweep of the home incident to the arrest of Sumbry inside the home.

Having found that the agents' quick look into the bedrooms just up the stairs in the small A-frame house was a valid protective sweep, I must now examine the more invasive search which resulted in the seizure of the shotgun and search of closets where ammunition was found. Another long-standing exception to the warrant requirement is an individual's voluntary consent to search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Government contends Ms. Brown voluntarily consented to a search of her home. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances" and no single factor controls. *Id.* at 227. "Relevant circumstances 'include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons." *Eidson v. Owens*, 515 F.3d 1139, 1146 (10th Cir. 2008) (citation omitted). A person's age, intelligence, education, experience with law enforcement and language ability are all relevant to the equation. *United States. v. Raibley*, 243 F.3d 1069, 1075-76 (7th Cir. 2001). It is the Government's burden to show, by a preponderance of the evidence, that Devin Brown's consent was voluntary. *United States v. Lechuga*, 925 F.2d 1035, 1041 (7th Cir. 1991).

The obvious fact supporting the consent to search is that Ms. Brown signed a consent to search form. She admits she signed it and admits it was read to her. She further testified that she reads, writes and understands the English language, and that

-16-

she at least partially read the form when it was presented to her. All of that strongly weighs in favor of a finding that her consent was voluntary. *E.g.*, *United States v. Budd*, 549 F.3d 1140, 1147 (7th Cir. 2008) (holding warrantless search valid where individual signed a consent to search form and admitted he was not threatened into signing it and partially read the document before signing).

The only real thing suggesting Ms. Brown's consent was not knowing and voluntary is her testimony that she misunderstood the form and that she was frightened. But the test is an objective one. What matters are the objective facts available to the officers at the time the consent was given that control. *See United States v. Richards*, 741 F.3d 843, 849 (7th Cir. 2014) ("Our review is aimed at 'regulating police conduct,' and to achieve that objective, the appropriate standard is what objective facts were known to the inquiring officer at the time consent was given.") (citation omitted). There was no objective evidence at the time which would undermine the voluntariness of her consent. There's no evidence that she was inebriated, intoxicated, or suffering any mental disability at the time of the search. Nor did she testify that she told officers she was scared and unable to focus or read the consent to search. Instead, she signed the document, which was clearly labeled "CONSENT TO SEARCH" and stated that agents were going to search her entire residence. All of which is to say that a homeowner can't invalidate their consent simply by saying after-the-fact she was subjectively confused.

Furthermore, Ms. Brown testified she had the presence of mind to hide the shotgun once she knew the police were at her door, which somewhat belies that she

-17-

was so scared she could not focus on what was happening a few minutes later. Also counting against Ms. Brown's credibility is that she has admitted to changing her story. She told officers she had no knowledge of the gun at the time of the search, but then at the evidentiary hearing, she testified that the weapon was hers. This cuts against believing her testimony that her consent was not knowing and voluntarily given.

In his supplemental memorandum, submitted after the evidentiary hearing, Sumbry argues that the consent search was invalid as a result of the protective sweep incident to Sumbry's arrest. He says that "[w]ithout the plain view of the shotgun during the alleged protective sweep[,] Federal agents lacked probable cause to request consent to search." [DE 60 at 3.] Unsurprisingly, there's no legal citation for this statement. Police do not need probable cause to conduct a search when there is a valid consent to search. *See United States v. Duran*, 957 F.2d 499, 501 (7th Cir. 1992) ("The fourth amendment permits police to conduct a warrantless search without probable cause if an authorized individual voluntarily consents to the search.") (citation omitted). And requiring probable cause before police may ask for consent (as Sumbry's brief seems to apply) would completely turn that notion on its head. Thus, while a subsequent valid consent may not retroactively cure a prior unconstitutional search, as discussed above, there was nothing unconstitutional about the protective sweep of the immediate areas of the house conducted by police incident to Sumbry's arrest. In sum, there was nothing unconstitutional about the search of Ms. Brown's home on the day Sumbry was arrested.

**Conclusion**

For the foregoing reasons, Defendant Joseph Sumbry's Motion to Suppress [DE 22] is DENIED.

SO ORDERED on July 28, 2020.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT